# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Florida Carpenters Regional Council Pension Plan, *et al.*, | ) ) ) | CASE NO.  12 CV 2001 |
| Plaintiffs, | ) ) | JUDGE PATRICIA A. GAUGHAN |
| vs. | ) ) | |
| Eaton Corporation, *et al.*, | ) ) | <u>Memorandum of Opinion and Order</u> |
| Defendants. | ) | |

This is a securities fraud class action brought against Defendant Eaton Corporation (Eaton) and individual defendants who served as senior executives of Eaton at the time of the events alleged, Alexander M. Cutler, Mark M. McGuire, Victor Leo, Donald J. McGrath, and Taras G. Szmagala, Jr.  Eaton and the individual defendants who are current Eaton executives (Cutler, McGuire, McGrath, and Szmagala) have filed a Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (complaint).  (Doc. 39.)  Defendant Victor Leo, Eaton's former Vice President and Chief Counsel of Litigation (who is not currently employed by Eaton) has filed unopposed motions to join Eaton's motion to dismiss and their

1

briefs.  (Doc. Nos. 41, 46.)  Leo's unopposed motions to join are granted.  In addition, for the reasons stated below, defendants' motion to dismiss plaintiffs' securities fraud complaint is also granted.

**Facts**

Eaton is an Ohio corporation headquartered in Cleveland, Ohio.  Plaintiffs KBC Asset Management NV and Florida Carpenters Regional Counsel Pension Plan are purchasers of shares of Eaton common stock during the period of August 2, 2009 through June 4, 2012.  Plaintiffs' allegations against Eaton in this case stem from events transpiring in a 2004 state court lawsuit filed by Eaton against former employees in Mississippi.  The following allegations are contained in plaintiffs' complaint.

In 2002, six Eaton engineers left Eaton and joined a North Carolina-based competitor of Eaton, Frisby Aerospace, Inc., now known as Triumph Actuation Systems (Frisby).  A former Frisby employee, Milan Georgeff, approached Eaton in 2003 and informed it that the six of its former engineers had improperly taken thousands of documents from Eaton containing trade secrets and proprietary information concerning products developed by Eaton.  On January 28, 2003, Eaton entered into a contract with Georgeff.  In exchange for Georgeff agreeing to provide information and testimony on Eaton's behalf, Eaton promised to pay Georgeff's expenses, defend any possible criminal or civil litigation brought against him, reimburse him for his time, and guarantee him lifetime employment.

Based on Georgeff's allegations, Eaton filed a lawsuit against Frisby in Mississippi state court on July 9, 2004, alleging theft and conspiracy against the former Eaton engineers ("the *Frisby* Litigation").  The *Frisby* Litigation was assigned to then-Hinds County,

Mississippi Circuit Court Judge Bobby DeLaughter.  Subsequently, Eaton's General Counsel Mark McGuire  "used Georgeff's allegations to convince the U.S. Attorney's office in Jackson, Mississippi to file criminal charges against five of the six former Eaton engineers." (Complt., ¶43.)

Plaintiffs allege that Eaton engaged in discovery abuse and litigation misconduct from the very beginning of the *Frisby* Litigation and, ultimately, the Mississippi state court dismissed Eaton's claims with prejudice as a sanction for its litigation misconduct.

In late 2005, in response to specific document requests from Frisby, Eaton did not produce the compensation agreement between Eaton and Georgeff, and denied that such an agreement existed.  Frisby later obtained the compensation agreement in connection with a concurrently-pending lawsuit by Georgeff against Frisby in North Carolina.  (Complt., ¶46.) On January 6, 2006, Frisby sought sanctions and dismissal of the *Frisby* Ligitation for Eaton's discovery violations and for improperly compensating a fact witness.  Judge DeLaughter referred the matter to Special Master Jack Dunbar for review and recommendation as to whether there had been discovery violations by Eaton and whether they were intentional.

On June 13, 2006, and December 5, 2006, Special Master Dunbar issued report and recommendations finding that Eaton had committed discovery violations and that they were intentional.  (Complt., ¶¶49, 51.)

"In late 2006, when it became clear that Special Master Dunbar's Report and Recommendation would find that Eaton had committed intentional discovery violations and that Eaton and its lawyers would be subject to serious sanctions, Eaton hired [Ed] Peters [ a

former Hinds County district attorney and DeLaughter's former boss and associate] to secretly influence DeLaughter."  (Complt., ¶52.)  Eaton's local trial counsel, Michael Allred, had recommended hiring Peters to defendant Leo because the lawyers were worried about the impact of the Special Master's report.  Eaton agreed to pay Peters a contingency fee of at least 1% of two hundred million dollars if the *Frisby* Litigation was ultimately successful.  (*Id*.)

After Eaton hired Peters, the litigation "took a dramatic turn in Eaton's favor."  (*Id*. at ¶10.)  Judge Delaughter "rejected nearly every recommendation Special Master Dunbar made in the coming months from everything from the schedule of the engineers' depositions to Dunbar's recommendation of more than $1.5 million in sanctions against Eaton for its discovery violations related to Georgeff."  (*Id*.)  Further, in October 2007, unhappy with Special Master Dunham, Peters called Larry Latham . . . and asked him if he would be willing to serve as special master on the case . . . . Latham told Peters he would, and, on October 27, 2007, DeLaughter *sua sponte* issued an order removing Dunbar as special master and replacing him with Latham."  (*Id*. at 11.)

DeLaughter's relationship with Peters became the subject of a federal investigation in December of 2007, when evidence from two investigations of trial lawyer Dickie Scruggs suggested that Scruggs had used Peters to influence DeLaughter.  Both Peters and DeLaughter were subpoenaed in the Scruggs investigation.  DeLaughter recused himself from the *Frisby* Litigation in January 2008.  Later, DeLaughter pleaded guilty to obstruction of justice, was  suspended from the bench, and served 18 months in prison.  In January 2008, it was publicly reported that the federal investigation of Peters and DeLaughter was being expanded to include an investigation of improper contacts between Peters and DeLaughter in

4

the *Frisby* Litigation.

Following DeLaughter's recusal, Judge Swan Yerger was assigned to the *Frisby* Litigation.  Judge Yerger stayed the proceedings and during 2008 and 2009, conducted an investigation of Peter's *ex parte* contacts with DeLaughter in the case, including requiring Eaton to produce all documents related to its retention of Peters.

Meanwhile, "Peters' testimony in the criminal case against Scruggs revealed that, if he had been asked to testify regarding his role in the Frisby Litigation on behalf of Eaton, Peters would have said he was 'brought into the case by Eaton . . . as someone who could influence DeLaughter'. . ." (Complt., ¶14.)  But when Eaton responded to the public revelation of the government's outline of Peters' expected testimony on August 2, 2009, and various times thereafter, Eaton made "false and misleading" public statements that it did not hire Peters to influence Judge LeLaughter.  Eaton also denied that there was "anything wrong with agreeing to illegally compensate Georgeff in exchange for certain testimony and . . . failing to disclose the Company's agreement with Georgeff despite repeated discovery requests from Frisby." (*Id.*, ¶ 85.)

However, in November 2009, Special Master David Dogan (the Special Master appointed in the case after Special Master Latham resigned from the case) issued a Report and Recommendation finding that Eaton was aware of the impact Peters had on the rulings Eaton received from Judge DeLaughter.  (*Id.* at ¶87.)

On January 6, 2010, Judge Yerger entered an order imposing sanctions of more than $1.5 million against Eaton for intentional discovery violations concerning Georgeff -- "contradicting Eaton's August 2, 2009 statement that [nothing Eaton did regarding Georgeff]

5

was illegal under Mississippi law."  (*Id.*, ¶89.)

On August 11, 2010, Special Master Dogan filed an R&R recommending that Eaton's lawsuit be dismissed with prejudice due to Eaton's repeated unlawful conduct in the litigation.  The Special Master detailed findings of fact demonstrating that Eaton knew or should have known of Peters's improper conduct.  He found that Eaton and its counsel kept Peters's involvement a secret despite Eaton's knowledge that Peters had been having improper *ex parte* conversations with DeLaughter.  (*Id.* at ¶91.)  The August 11, 2010 Report and Recommendation was filed under seal and remained under seal until a redacted version was released after the class period.  (*Id.*)

On December 22, 2010, in an opinion that was unsealed on December 29, 2010, Judge Yerger dismissed the *Frisby* Litigation because Eaton had hired Peters to improperly influence DeLaughter.  The opinion stated that Eaton's in-house counsel was aware of Peters' *ex parte* contacts and that Eaton's general counsel, defendant McGuire, was aware of the scheme.  Judge Yerger's December 2010 opinion stated:  "The court finds, by clear and convincing evidence, that Eaton and its counsel were aware of and, in fact, sanctioned Peters' clandestine actions, either through affirmation or inaction, with then-Judge DeLaughter, for Eaton's benefit."  (*Id.* at ¶92.)

"Despite Judge Yerger's findings, Eaton continued to proclaim its innocence and did nothing to remedy its wrongdoing."  (*Id.* at ¶93.)  In particular, Eaton took no action regarding its general counsel, defendant McGuire, or other in-house attorneys.  Following the dismissal of Eaton's case, McGrath again stated, "We in no way asked Ed Peters to try and influence Judge DeLaughter or any other judge."  McGrath went on to state that "Eaton is a

value-based organization . . . . [and was] very disappointed in the decision."  McGrath said

that Judge Yerger's decision would be appealed and that Eaton would "continue to work with

federal prosecutors' efforts to convict the engineers."  (*Id*.)  According to plaintiffs'

complaint, Eaton's appeal is still pending before the Mississippi Supreme Court, and Frisby's

counterclaims against Eaton are still pending in the *Frisby* Litigation. (Complt., at ¶16.)

Judge Jeff Weill was assigned to the *Frisby* Litigation in January 2011 following the

retirement of Judge Yerger on December 31, 2010.  In 2011, Eaton continued to deny

wrongdoing.  Its spokesman Gary Klasen stated, "Eaton strongly disagrees with Judge

Yerger's ruling.  Eaton was not aware that Mr. Peters was engaging in improper conduct with

the judge on its case."  (*Id.*, ¶95.)

Defendant Cutler appeared on CNBC's Mad Money program on January 28, 2011,

touting the company's strong first quarter financial results "and expectations of future growth

and margin expansion."  (*Id.*, ¶96.)

In April 2012, Eaton submitted to the court two previously withheld documents *in

camera*.  These documents pertained to March and October 2007 email chains.  In the March

email chain, Peters advised defendant Leo that Judge DeLaughter was "spending every free

minute" on a crucial ruling in the lawsuit and that "we are getting priority time."  In a follow-

up email, Peters said he was "REALLY pushing to get the ox out of the ditch, but the Jdg IS

in trial for the next 2-3 weeks" and that he was "PUSHING."  In an October 2007 email

string, Peters wrote to an Eaton lawyer:  "If you can keep mgmt. off your back for just a short

time (relatively) I think they will be VERY pleased with you."  (*Id.*, ¶¶ 98-99.)

On May 10, 2012, Judge Weill ordered Eaton to produce all documents related to its

retention of Peters.  Judge Weill also ordered Cutler to submit a sworn affidavit personally certifying that any and all responsive documents had been produced.  Further, each of the individual defendants except McGrath were ordered to submit affidavits providing full and detailed explanations as to the withholding of the newly discovered documents, the withholding of any other responsive documents, the reasons for the withholding, the responsibility for the withholding, exactly how the documents were discovered, and exactly why the documents were not previously discovered.  (*Id.*, ¶100.)

Eaton produced over 8,000 pages of documents in May 2012 that were responsive to previous discovery requests and related to the Mississippi court's Peters/DeLaughter inquiry. (*Id.* at ¶17.)  According to plaintiffs, these withheld documents

> contained a treasure trove of incriminating emails between Peters and Eaton's counsel, including defendants McGuire, Leo, and Szmagala.  Faced with this overwhelming evidence of wrongdoing, Eaton fired Leo and Sharon O'Flaherty, two of its most senior in-house attorneys, in May 2012 in an attempt to lay blame for the repeated discovery violations at the attorneys' feet. In addition, the U.S. Attorney's office, without providing a reason, dismissed the criminal indictments against the five former Eaton engineers.  The firings and criminal dismissal became public on May 30, 2012, and Eaton's stock price fell from $43.34 to $42.66 in response, a market capitalization loss of over $229 million.

(*Id.* at ¶18.)

In addition:

> Soon after, affidavits from each of the defendants filed at the direction of Judge Weill were made public on May 31, 2012.  Defendant Cutler's affidavit, for example, stated, "I have learned sufficient information thus far to cause me to believe Eaton's high standards were not met with respect to its obligations to the Court and opposing parties in this case to search for and produce documents responsive to discovery requests and court orders during 2008 and 2009."

(*Id.* at ¶19.)[1]

Plaintiffs allege that "[a]mid a flurry of news articles regarding the affidavits and firings, Eaton's stock price continued to fall, from $42.66 on May 31, 2012 to $40.24 on June 1, 2012." "As additional facts became known, Eaton's stock dropped again on Monday, June 4, 2012 to $39.21 for a total market capitalization loss of nearly $1.4 billion." (*Id.* at ¶19.)

**Standard of Review**

A case may be dismissed if the complaint does not state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "A motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Consequently, the court must construe the complaint in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). However, the court is not required to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

---

[1]

The complaint alleges that each of the individual defendants, except for McGrath, filed affidavits with the court acknowledging that Eaton had not turned over discovery materials mandated by the court's various orders in 2008 and 2009. (Complt., ¶106.) In addition to the allegations regarding McGrath's affidavit set forth above, the complaint alleges that defendant McGuire stated in his affidavit that, "As General Counsel of Eaton with oversight of its legal function, I accept responsibility for the failure to produce in 2008 the newly discovered emails. While I delegate responsibility to others in the legal function to handle litigation and particularly discovery matters, I remain the leader of the function and am very disappointed to learn of the serious lapses that occurred in this matter. (*Id.*,¶107.)

In order to survive a motion to dismiss, a complaint's factual allegations must be enough to raise a right to relief above the speculative level. *Ass'n of Cleveland Firefighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). That is, the complaint must contain sufficient factual material to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**Discussion**

Plaintiffs allege claims against defendants on behalf of a class of purchasers and acquirers of Eaton securities during the period of August 2, 2009 through June 4, 2012, pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  Count I  alleges that, during the class period, defendants issued false and misleading statements regarding their improper litigation practices in violation of Section 10(b) and Rule 10b-5.  They allege that:

> During the Class Period, Eaton and the Individual Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did:   (a) deceive the investing public, including Plaintiffs and the Class, regarding Eaton's litigation practices; (b) artificially inflate and maintain the market price of Eaton's securities; and (c) cause Plaintiffs and the Class to purchase Eaton securities at artificially inflated prices and, as a result, suffer economic losses when the truth about and impact of Defendants' fraud was revealed.

10

(*Id.*, ¶139.)  Plaintiffs contend defendants made at least seven actionable false and misleading

statements during the class period:

> • On August 2, 2009, defendant McGrath, Eaton's Senior Vice President of
> Communications, stated, "There are a lot of false statements in here . .. In no
> way did we ask Ed Peters to imply or ask or insinuate that that he would do
> anything improper in trying to influence Judge DeLaughter or any other
> judge." [Complt.,] ¶84.  McGrath went on to comment on the Company's
> payments to Georgeff, stating, "[n]othing we did with that whistle-blower was
> illegal under Mississippi law." *Id.*

> • On September 22, 2009, McGrath stated: "At no time did we hire Peters to
> influence DeLaughter in any way."  ¶86.

> • On December 26, 2009, McGrath stated, "We didn't hire him (Peters) to do
> anything improper . . . .  We in no way asked Ed Peters to try to influence
> Judge DeLaughter or any other Judge. ¶88.

> • On June 28, 2010, McGrath again stated, "We in no way asked Ed Peters to
> try to influence Judge DeLaughter or any other Judge.  ¶90.

> • In a December 31, 201 article, McGrath again stated, "We in no way asked
> Ed Peters to try and influence Judge DeLaughter or any other judge.  ¶93.

> • On January 17, 2011, Eaton again denied wrongdoing.  Eaton spokesman
> Gary Klasen stated, "Eaton strongly disagrees with Judge Yerger's ruling.
> Eaton was not aware that Mr. Peters was engaging in improper conduct with
> the judge on its case."  ¶95.

> • On May 11, 2012, Eaton, unbelievably, "said there is no evidence that Peters
> tried to sway the judge [DeLaughter] or that Eaton or its employees engaged in
> or knew about improper conduct."  ¶101.

(Pltfs. Opp. at 10-11.)

Count II alleges control person liability for Eaton's violations against the individual

defendants under Section 20(a) of the Exchange Act.  Count II alleges:

> By virtue of their high-level positions and their ownership and contractual
> rights, participation in and awareness of the Company's operations, and
> intimate knowledge of the false statements and omissions made by the
> Company and disseminated to the investing public, the Individual Defendants

11

had the power to influence and control and did influence and control, directly
and indirectly, the decision-making of the Company, including the content and
dissemination of the various statements which plaintiffs contend are false and
misleading.

(*Id.*, ¶153.)

Defendants argue that plaintiffs' complaint fails to allege any plausible claim.

**Count I**

Section 10(b) of the Exchange Act and Rule 10b–5 prohibit "fraudulent, material

misstatements or omissions in connection with the sale or purchase of a security."  *Frank v.*

*Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008), quoting *Morse v. McWhorter*, 290 F.3d 795,

798 (6th Cir.2002).  To state a securities fraud claim under Section 10(b), a plaintiff "must

allege, in connection with the purchase or sale of securities, the misstatement or omission of a

material fact, made with scienter, upon which the plaintiff justifiably relied and which

proximately caused the plaintiff's injury."  *Dana*, 547 F.3d at 569.  Securities fraud claims

arising under Section 10(b), as with any fraud claim, must also satisfy the particularity

pleading requirements of Fed. R. Civ. P. Rule 9(b).  Accordingly, a complaint must "(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3)

state where and when the statements were made, and (4) explain why the statements were

fraudulent." *Id*. at 789, quoting *Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879, 883

(N.D.Ohio 1998).

Defendants contend Count I fails to state a plausible claim under Section 10(b) and

Rule 10b-5 because the complaint fails to plead facts sufficient to allow the Court to

conclude: (1) that there was any actionable fraud or misrepresentation made by Eaton; (2) that

any alleged misstatement would have been material to a reasonable investor; (3) that Eaton or

any of the individual defendants acted with scienter or had any plausible motive to engage in securities fraud; and (4) that a causal connection exists between defendants' alleged statements and Eaton's share price.

Defendants contend there is no actionable misrepresentation because denials of legal liability made by a company during litigation are not actionable as a matter of law.  They contend Eaton's alleged misstatements could not plausibly have been material to investors in light of the "total mix" of public information available at the time.  The Court, however, will assume for purposes of the pending motion to dismiss that an actionable, material misrepresentation is alleged.  Plaintiffs assert in their opposition brief that they have not simply alleged that defendants *denied* liability in the *Frisby* Litigation, but rather, they have also alleged that defendants made actionable "affirmative" misstatements.  Further, plaintiffs cite authority supporting the proposition that materiality is generally an issue reserved for the trier of fact.  Accordingly, the Court does not find dismissal warranted on the first two bases argued by defendants.

Defendants' third argument is that plaintiffs' complaint is insufficient the meet the "[e]xacting pleading requirements" for pleading scienter in securities fraud cases.  Pleading claims for fraud always required a high level of particularity, *see* Fed. R. Civ. P. 9(b), but the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires an even higher standard for pleading scienter in securities-fraud cases.  The PSLRA requires that, in order to avoid dismissal, a plaintiff must plead "with particularity facts giving rise to a strong inference" of scienter.  *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 469 (6th Cir. 2011).  The PLSRA requires that plaintiffs "specify each statement alleged to have been misleading, the

13

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*  In addition, the PSLRA requires that plaintiffs, "with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* Although the PSLRA does not define what constitutes the required state of mind, the Sixth Circuit has defined it as a "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Id.*

The Supreme Court has further clarified that in order to a qualify as a "strong inference" (and avoid a dismissal), the inference of scienter drawn from the facts "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In determining scienter, the court assesses the facts "holistically." *Tellabs, Inc.*, 551 U.S. at 326.  Thus, the court must decide whether all of the facts alleged, taken collectively, meet the PSLRA's requirements. *Tellabs*, 551 U.S. at 322–23, 127 S.Ct. 2499.

Defendants contend plaintiffs' factual allegations are insufficient to support a plausible inference that defendants' denials of wrongdoing in the *Frisby* Litigation constituted a knowing and deliberate intent to manipulate, deceive, or defraud Eaton's investors or the market.  Defendants contend plaintiffs' allegations of scienter contained in paragraphs 117 and 118 of the complaint – alleging that defendants were motivated "to deceive the investing public with respect to the Frisby Litigation because doing so inflated Eaton's stock price,

14

thereby increasing their personal wealth and securing their ongoing position with the Company," and that defendants "were highly motivated" to commit fraud because a "large portion" of their compensation packages were dependent upon Eaton posting favorable financial results" – are insufficient as a matter of law.  Defendants rely on cases standing for the proposition that general allegations of an officer's desire to protect his position within a company, increase stock prices, or maintain his employment are insufficient to demonstrate scienter.  (*See* Def. Mem. at 22-23, citing cases.)  As defendants point out, Courts of Appeals have recognized that if such general allegations were sufficient, then "executives of virtually every corporation in the United States would be subject to fraud allegations." *Tuchman v. DSC Commc's Corp*., 14 F.3d 1061, 1068 (5th Cir. 1994).  *See also Acito v. IMCERA Group, Inc*., 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").

Defendants also argue that plaintiffs' allegations "that Cutler sold some of his Eaton shares in 2010 and again in February and March 2011 do not allow for a strong (or indeed any) inference of scienter."  (Def. Mem. at 23.)  On this point, defendants cite cases standing for the proposition that "executive stock sales, standing alone, are insufficient to establish a strong inference of fraudulent intent." *See, e.g., Bristol-Myers Squibb Sec. Litig*., 312 F. Supp.2d 549, 561 (S.D.N.Y. 2004).  As the Seventh Circuit acknowledged in *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008), executives "sell stock all the time"; therefore, in order "to constitute circumstantial evidence of scienter," the stock sales must by "unusual or suspicious."  Defendants contend Cutler's sales of his shares were not unusual or suspicious,

15

pointing out that plaintiffs' own allegations show that Cutler's "alleged sales in 2011 were *after* the *Frisby* case had been dismissed and the Mississippi trial court's views were publicly disclosed." (Def. Mem. at 24.)[2]  Defendants further assert that since a sizable percentage of Cutler's compensation is paid in Eaton shares, it is logical that he would sell shares at various times, and plaintiffs have not alleged facts suggesting that Cutler's sales made before May 2012 "differed in timing or amount from other sales Cutler made during the putative class period or at other times."  *Id.*  Defendants assert that Eaton's proxy statements report that Cutler's holdings of Eaton's common shares in fact increased, rather than decreased, during the putative class period, and defendants cite cases standing for the proposition that no scienter exists where an insider's sales of stock are offset by even larger acquisitions during the relevant time.  (Def. Mem. at 24-25.)

In sum, defendants contend:

The more cogent and compelling inference from Plaintiffs' allegations is that Defendants had no fraudulent intent in responding to what Defendants continue to believe were incorrect decisions by the Mississippi trial court. With no plausible motivation for the "fraud," no allegations of falsity, and no link of any kind between the ultimate outcome of the Frisby litigation and any aspect of Eaton's past or future performance, the substantially more compelling inference to be drawn from Plaintiffs' allegations is that Eaton and the Individual Defendants acted and continue to act with non-fraudulent intent.

If anything, Plaintiffs' allegations try to make out a conclusory and legally insufficient mismanagement claim.  (*See, e.g.*, ¶¶120, 121.)  But such generic allegations cannot support an inference of scienter (much less a strong one), because mismanagement is not actionable under the securities laws.

(Def. Mem. at 26.)

---

[2]

Moreover, defendants point out that plaintiffs make no allegations of stock sales by any other defendant.  (*Id*. at 25, n. 7.)

16

In their opposition brief, plaintiffs urge a recklessness theory of scienter, arguing that they "identify numerous red flags that strongly suggest the Individual Defendants knew, or were reckless in not knowing, that the Company's statements concerning Peters were false."[3] (Pltf. Opp. at 20.)  The "red flags" plaintiffs identify are the "public allegations of wrongdoing" that existed against Eaton during the class period and the orders of the Mississippi court in *Frisby* finding that Eaton engaged in discovery wrongdoing.  According to plaintiffs, the public information and orders of the Mississippi court "should have alerted Defendants to the likelihood of ongoing wrongdoing in the *Frisby* Litigation."  (Pltf. Opp. at 21.)

Plaintiffs also argue that Cutler's stock sales were unusual and suspicious and "contribute to a strong inference of scienter."  Without citing to any factual allegations in the complaint, plaintiffs assert:

> In 2010, . . . prior to the dismissal of the Frisby Litigation, and after he was aware of Eaton's wrongdoing, Cutler sold more than 1.3 million shares for approximately $54 million.  In 2011, after the Frisby Litigation had been dismissed but while the Company continued to deny wrongdoing, and within two weeks of his appearance on NBC's Mad Money, Cutler sold nearly 500,000 more shares for approximately $26 million.  Similarly, in 2012, six weeks before Eaton submitted previously-withheld documents in the Frisby Litigation, Cutler sold more that 500,000 more shares for approximately $26 million.  Such sales are suspicious and give rise to a strong inference of scienter because they were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."

---

[3]

Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it. Recklessness is not negligence, but more akin to conscious disregard.  *Dana*, 646 F.3d at 959.

17

(Pltf. Opp. at 22-23.)

Finally, plaintiffs argue that scienter can be inferred from the fact that Eaton

terminated Leo and O'Flaherty following the individual defendants' acknowledgments in

May 2012 that Eaton failed to comply with its discovery obligations and on the basis of their

allegations that the individual defendants were "motivated by bonuses and job security." (Pltf.

Opp. at 24.)

The Court, however, agrees with defendants that plaintiffs' complaint fails to meet

"the exacting standards" for pleading scienter in a securities fraud case.  Plaintiffs'

allegations, viewed holistically, do not support "a strong inference that the defendant[s] acted

with the required state of mind."  *Ashland,* 648 F.3d at 469.  The facts alleged do not support

a plausible inference that the persons responsible for making the alleged public misstatements

on behalf of Eaton did so with knowledge that the statements were false and made the

statements with a "deliberate intent to manipulate, deceive, or defraud" Eaton's investors or

the market.  Rather, the far more compelling inference to be drawn from the alleged facts is

the inference defendants assert, that Eaton mismanaged the *Frisby* litigation and failed to

comply with its discovery obligations in the case, and that it ultimately and reasonably fired

the two in-house lawyers (Leo and O'Flaherty) who had direct responsibility for the *Frisby*

Litigation and the missteps that occurred.

Plaintiffs' attempts to argue that some of the factors the Sixth Circuit has recognized

as potentially indicative of scienter exist here,[4] are unpersuasive and do not support a strong

_____

[4]

Prior to *Tellabs*, the Sixth Circuit set forth the following non-exhaustive list of
facts that do not necessarily establish scienter but are "usually relevant" to its analysis: (1)
insider trading at a suspicious time or unusual amount; (2) divergence between internal

inference of scienter. First, plaintiffs' contention that Cutler's stock sales contribute to a strong inference of scienter is unpersuasive. As defendants point out in their reply brief, plaintiffs do not allege facts in their *complaint* demonstrating the nature of Cutler's stock transactions, nor does the complaint allege facts supporting a plausible inference that Cutler's transactions were unusual or suspicious. Further, there are no facts pleaded in the complaint demonstrating that Cutler had any personal, contemporaneous knowledge of the events leading up to the Mississippi court's 2010 dismissal (which dismissal had already occurred by the time of his share transactions and his television appearance on *Mad Money*) or that he participated in any fraudulent scheme.

Second, Eaton's terminations of Leo and O'Flaherty do not support a strong inference of scienter. Plaintiffs have not alleged facts supporting a plausible inference that Leo and O'Flaherty were terminated by Eaton for any reason other than the compelling plausible reason asserted by defendants, *i.e.*, that these in-house lawyers were terminated because they were the lawyers with primary responsibility for the *Frisby* Litigation, which was mismanaged and resulted in discovery sanctions. In short, the fact that Eaton terminated these lawyers does not support a plausible inference that Eaton intended to defraud investors

---

reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fruad by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implication could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *See Dana*, 646 F.3d 954, at 958, note 2.

in any way.

Third, plaintiffs' generic allegations that the individual defendants had economic incentives, in terms of maintaining their positions in the company and their salaries, do not support a strong inference of scienter.  As defendants point out, executives are always incentivized to maintain their positions and salaries in a company.  Courts have held that without other evidence, a defendant's inherent desire to maintain job security and personal wealth is insufficient to show scienter.  *See, e.g., PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004), *abrogated in part on other grounds by Tellabs*, 551 U.S. 508 ("All corporate managers share a desire for their companies to appear successful.  That desire does not comprise a motive for fraud. . . . Neither does an executive's desire to protect his position within a company or increase his compensation.").  This Court likewise does not find an alleged general desire on the part of the individual defendants to maintain their positions within the company and increase their salaries to be indicative of scienter.

Finally, plaintiffs' contention that they have alleged scienter by demonstrating recklessness is unavailing.  "Although circumstantial evidence of conscious misbehavior or recklessness may support a strong inference of scienter, the strength of the circumstantial evidence must be correspondingly greater if there is no motive."  *See Campo v. Sears Holdings Corp*., Case No. 09-3589, 2010 WL 1292329, at *3 (2d Cir. Apr. 6, 2010).  Thus, courts have found that no inference of scienter exists where plaintiffs' view of the facts "defies economic reason."  *See id*. at *2 (2d Cir. Apr. 6, 2010) ("Where plaintiff's view of the facts defies economic reason, . . . it does not yield a reasonable inference of fraudulent intent.")  As defendants persuasively point out in their reply brief, plaintiffs have not

20

articulated or alleged in their complaint any plausible "overarching reason" why defendants would conceal anything about the *Frisby* Litigation from investors in the first place.  Plaintiffs have not alleged facts supporting a plausible inference that Eaton's performance and future prospects were in any way tied to the success or failure of the *Frisby* Litigation, or that the *Frisby* Litigation had any impact on Eaton's overall performance or its share price at any time.  Thus, plaintiffs have not alleged facts supporting a plausible inference that Eaton had an economic reason to misrepresent the facts about Eaton's discovery conduct in *Frisby* during the class period or at any time.

Furthermore, even if it can be said that Eaton's general counsel should have been alerted to the possibility that Eaton engaged in discovery misconduct in *Frisby* by virtue of press reports and orders issued in the case, this does not support a reasonable inference that the individual defendants "were reckless in not knowing, that the Company's statements concerning Peters were false."  (Pltf. Opp. at 20.)  As defendants emphasize, Eaton has not conceded that it hired Peters for an improper purpose and continues to maintain, in its ongoing appeal in the Mississippi courts, that it did not do so.  As defendants maintain, there is nothing unusual or suspicious about a company defending its conduct in litigation, and it cannot be said that Eaton consciously disregarded facts or recklessly made misstatements about Peters solely on the basis of findings of the Mississippi trial court that are currently being appealed.

The Sixth Circuit has instructed that, when faced with a motion to dismiss an action brought under Section 10(b), the court's inquiry is to determine "whether all of the fact alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegations, scrutinized in isolation, meets that standard." *Dana*, 646 F.3d at 959.

In making this determining, the court "must take into account plausible opposing inferences."

*Id*.  A complaint will give rise to an inference of scienter and survive dismissal "only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as

any opposing inference one could draw from the facts alleged."  *Id*.

　　　　This Court finds that a reasonable person would not deem the inference of scienter

urged by plaintiffs here as cogent and compelling as the more plausible opposing inference

urged by defendants when the facts are considered holistically.  The Court finds the facts

plaintiffs allege insufficient to give rise to a "strong inference" of scienter.  Accordingly, for

this reason, plaintiffs' complaint fails to plead a viable claim under Section 10(b) and Rule

10b-5.

　　　　In addition to a lack of adequate allegations to support scienter, the Court finds

defendants' fourth argument in support of dismissal persuasive, that plaintiffs' securities

fraud claim is insufficient because it fails to plead facts – as opposed to merely conclusory

statements – demonstrating loss causation.  A plaintiff must allege and prove "loss causation"

in a securities fraud case, *i.e*., that a causal connection exists between the alleged material

misrepresentation and the plaintiffs' loss.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544

U.S. 336, 341 (2005).

　　　　Plaintiffs allege that defendants' repeated denials of misconduct in the *Frisby*

Litigation during the class period "artificially inflated the price of Eaton securities and

operated as a fraud or deceit on Class Period purchasers" and that when Eaton "finally

admitted that it had withheld over 8,000 pages of documents" relating to Eaton's attempts to

22

improperly influence Judge DeLaughter in May 2012, Eaton's "stock price fell precipitously

as the artificial inflation created by Defendants' misrepresentations and wrongful course of

conduct was removed from the Company's stock price." (*Id.* ¶¶ 110, 112.)  Defendants argue

these allegations are insufficient to plead loss causation because they are merely conclusory

statements and fail to plead facts "that connect the *Frisby* Litigation to an inflation of Eaton's

share price or [that] connect the repetitive disclosures 18 months after the *Frisby* dismissal to

the drop in Eaton's share price in 2012." (Def. Mem. at 26.)  Defendants contend a mere

"coincidence" between a price decline and the release of the *Frisby* Affidavits is insufficient.

Defendants contend that to plead loss causation, the plaintiffs must plead facts connecting the

drop in Eaton's stock price to the alleged misconduct rather than other causes or intervening

events.  (*See* Def. Rep. at 23.)[5]  Defendants contend plaintiffs' allegations are insufficient for

the Court to conclude either that defendants' statements regarding Eaton's litigation conduct

gave rise to Eaton's share price, or that the allegedly "corrective" disclosures Eaton made in

the May and June 2012 affidavits in response to the Mississippi state court's orders caused a

drop in its share price.[6]  Rather, the complaint "is devoid of any facts supporting a plausible

---

[5]

     Defendants contend that there were other factors that caused the drop in Eaton's
share price and ask the Court to take judicial notice of various exhibits attached to the
Declaration of Andrew G. Fiorella demonstrating the existence of an alternative
explanation, specifically, Eaton's acquisition of Cooper Industries.  (*See* Doc. 40.)
Plaintiffs oppose the request to take judicial notice.  The Court need not determine
defendant's "request" for judicial notice as the Court can determine whether plaintiffs'
allegations are sufficient to survive a motion to dismiss on the basis of the complaint
alone, without considering defendants' exhibits or alternative explanation.

[6]

     Defendants assert that plaintiffs have failed to point to any facts in their
complaint, for example, indicating that any financial analyst attached significance to the
*Frisby* Litigation on Eaton's share price. Rather, defendants contend that financial

23

connection between Defendants' alleged statements or the release of the Frisby Affidavits and a change in Eaton's share price."  (Rep. at 23.)

In their opposition brief, plaintiffs assert that, although they "will ultimately be tasked with disentangling the portion of the stock drop attributable to the disclosure of fraud from the portion attributable to other factors," their allegations are sufficient – at the pleadings stage – to identify "a plausible connection between the [alleged] fraud and the loss of which they complain" for purposes of surviving a motion to dismiss.   (Pltf. Opp. at 26-27.)

The Court, however, agrees with defendants that plaintiffs' conclusory allegations are insufficient to plead loss causation.  Although the Sixth Circuit has not specifically addressed whether loss causation is subject to the heightened pleading standard set out in Rule Fed. R. Civ. P. 9(b), the Sixth Circuit has acknowledged in *D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994, 999 (6th Cir. 2005) that after *Dura*, 544 U.S. 336, more than mere "boilerplate language" is required.  It is not sufficient for a complaint, for example, to allege only that plaintiffs paid artificially high prices for a corporation's publicly traded securities.  Rather, a complaint must specify "the relevant economic loss" the plaintiff sustained and describe "how the loss occurred."  *D.E. & J.*, 133 Fed. Appx. at 999, 1000.  This includes pleading when the alleged fraud became known, estimating the damages the alleged fraud caused, and (most critically) connecting, other than in "boilerplate language," the alleged loss

---

analysts blamed the drop in Eaton's share price in 2012 to an $11.8 billion acquisition made by Eaton of Cooper Industries, and to a downgrade in Eaton's credit rating based in part on the acquisition costs, not to any events occurring in the *Frisby* Litigation 18 months earlier.  Defendants contend there are no facts alleged in plaintiffs' complaint suggesting a link between Eaton's stock price and its representations in the *Frisby* Litigation.

with the defendants' disclosure.  As the *D.E.& J.* Court recognized, even if a plaintiff resells

shares at a lower price, the lower price may not reflect an earlier misrepresentation, but may

reflect changed economic circumstances, changed investor expectations, or other events.

Without the requirement that a plaintiff provide the defendant with notice of the alleged loss

and "the causal connection the plaintiff has in mind," the securities laws would become

nothing more than "a partial downside insurance policy."  *Id*. at 999.

Plaintiffs' allegations are insufficient to meet the requirements for pleading loss

causation under *Dura* and *D.E.& J.*  Plaintiffs have not alleged sufficient facts to identify the

relevant economic loss or the causal connection they contend exists between their economic

loss and defendants' misrepresentations.  Plaintiffs merely state that "Defendants actions

artificially inflated the price of Eaton securities" and that the "price decline" that occurred in

May and June 2012 was a "direct result of the nature and extent of Defendants' fraud finally

being revealed to investors and the market." (Complt., ¶¶ 110, 114.)  But plaintiffs do not

allege facts supporting their conclusory statements.  In particular, they allege no facts

suggesting a plausible inference that the price decline in Eaton's stock in 2012 was causally

connected to the statements made in the *Frisby* Affidavits  – statements that were made 18

months after the Mississippi trial court entered its order dismissing the *Frisby* case.

Plaintiffs' unsupported allegations that defendants' misstatements caused their loss are

merely "boilerplate" and are insufficient to plead loss causation under *Dura* and *D.E.& J.*

For the stated above, plaintiffs' securities fraud claim alleged in Count I fails to state a

plausible claim.  The complaint fails to plead facts supporting a "strong inference" of scienter

and fails to adequately plead loss causation.  Accordingly, defendants' motion to dismiss the

complaint is granted with respect to Count I.

**Count II**

As stated above, Count II alleges claims against the individual defendants for control person liability under section 20(a) of the Exchange Act.  Plaintiffs failure to state a claim under section 10(b), however, precludes relief under section 20(a).  *See, e.g.*, *D.E.&J Ltd. Partnership v. Conaway*, 284 F.Supp.2d 719, 750 (E. D. Mich. 2003) ("It is axiomatic that in order to allege a *prima facie* claim of 'controlling person' liability under Section 20(a), the plaintiff must first plead a primary violation of Section 10(b).  Because as discussed above, Plaintiffs have failed to withstand dismissal of their § 10(b) claim, their Section 20(a) claim against these Defendants fail as a matter of law.")

Accordingly, defendants' motion to dismiss plaintiffs' complaint is granted with respect to Count II.

**Conclusion**

For all the reasons stated above, defendants' motion to dismiss plaintiffs' complaint is granted.[7]

---

[7]

Plaintiffs' informal request in their brief for leave to amend their complaint a second time, without more, is denied.

IT IS SO ORDERED.


/s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
Date:   8/09/13            United States District Judge

27